UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ESSEX INSURANCE COMPANY,

    Plaintiff,

v.                                                 CASE NO. 8:14-cv-356-T-23TGW

KART CONSTRUCTION, INC., et al.,

    Defendants.

_____/

## **ORDER**

Kart Construction submitted to Essex Insurance a claim for indemnity. Essex denied the claim and sues (Doc. 117) Kart for a judgment declaring that Essex has no duty to indemnify Kart. Essex moves (Doc. 120) for summary judgment.

## **BACKGROUND**[1]

On August 21, 2013, a 127-foot cell tower caught fire. The tower consisted of telescoped cylinders, that is, progressively smaller cylinders stacked vertically with

---

[1] "When ruling on a summary judgment motion, the court must construe the facts and draw all rational inferences therefrom in the manner most favorable to the nonmoving party." *Georgia State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1343 (11th Cir. 2015). The facts in this order are either undisputed or construed in Kart's favor.

the largest-diameter cylinder at the bottom. The fire occurred on the third day of a three-day operation in which Kart welded three "bridge stiffeners" and three plates to two cylinders that connected at an elevation of 100 feet. Kart welded the three "bridge stiffeners" across the intersection of the two cylinders and welded the three plates just above the intersection. The lowest welding occurred at an elevation of 97 feet; the highest welding occurred at an elevation of 107 feet.

During the three-day welding operation, "there was no work being performed on anything other than the metal exterior of the" tower. (Doc. 125 ¶ 9) Kart's welder, an experienced welder who "adhered to all applicable welding procedures" and put "in place" "all fire prevention measures," noticed a fire a "short period of time" after "weld[ing] the last piece of metal to the exterior" of the tower. (Doc. 125 ¶¶ 11, 12, 21) The fire, which "occurred by chance from unknown or remote causes," damaged "Sprint antennas, T-Mobile antennas, tower lights, cabling, foundations, and other equipment." (Doc. 124 ¶¶ 16) "The . . . cable is not part of the [tower] upon which the work was performed." (Doc. 125 ¶ 16)

At the time of the fire, Essex insured Kart under a standard "Commercial General Liability Coverage" policy, and the policy's coverage provision included the

fire damage.² However, Sections I(2)(j)(5) and (j)(6), which exclude damage otherwise covered, state:

> **2. Exclusions**
>
> This insurance does not apply to:
>
> . . . .
>
> **j. Damage To Property**
>
> "Property damage" to:
>
> . . .
>
> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

(Doc. 120-1 at 13, 15–16)³

---

² The policy's coverage provision states:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for . . . "property damage" to which this insurance does not apply.

(Doc. 120-1 at 12–13)

³ The policy defines the terms in quotation marks. "Property damage" means:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Doc. 120-1 at 26) "Your work":

(continued...)

Under the policy, Kart submitted a claim to Essex for the damage that the fire caused. Citing the exclusions in Sections (j)(5) and (j)(6), Essex denied Kart's claim. Essex sues for a declaration "finding [that Essex has] no duty to defend and no duty to indemnify Kart Construction." (Doc. 120 at 16) Essex moves (Doc. 120) for summary judgment.[4]

## DISCUSSION

"[C]onstruction of an insurance policy . . . is a question of law." *Washington Nat'l Ins. Corp. v. Ruderman*, 117 So. 3d 943, 948, 950 (Fla. 2013). "[I]nsurance contracts are construed according to their plain meaning." *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005). The parties agree that Kart's policy covers all the damage that the fire caused unless Section (j)(5) or (j)(6)

---

[3] (...continued)
  a. Means:
    (1) Work or operations performed by you or on your behalf; and
    (2) Materials, parts or equipment furnished in connection with such work or operations.
  b. Includes:
    (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and
    (2) The providing of or failure to provide warnings or instructions.

(Doc. 120-1 at 27) "Occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 120-1 at 25)

[4] Essex's motion for summary judgment requests relief not requested in the *ad damnum* clause or elsewhere in the complaint, which requests only a judgment declaring that "Essex has no duty to indemnify Kart . . . with respect to" the claim for the damaged tower. (Doc. 117 at 6) Nonetheless, under Rule 54(c), Federal Rules of Civil Procedure, "[e]very . . . final judgment [other than a default judgment] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."

excludes coverage. Essex argues and Kart disputes that Sections (j)(5) and (j)(6) exclude from coverage the damage to the tower.

**1. Section (j)(5)**

Section (j)(5) excludes from coverage "'[p]roperty damage' to . . . [t]hat particular part of real property on which [Kart is] . . . performing operations, if the 'property damage' arises out of those operations." *Columbia Mutual Insurance Co. v. Schauf*, 967 S.W.2d 74, 77 (Mo. 1998), best explains the purpose of commercial general liability insurance and the exclusion in Section (j)(5):

> [A commercial general liability] policy insures, among other things, certain property damage caused by accident to the property of others. The intent of [commercial general liability] policies . . . is to protect against the unpredictable, potentially unlimited liability that can be caused by accidentally causing injury to other persons or their property.
>
> A commercial general liability policy . . . is not intended to protect business owners against every risk of operating a business. Some risks, termed "business risks," are considered the responsibility of the business owner, rather than the insurer; consequently, they are excluded from coverage. Business risks are those risks that are the normal, frequent, or predictable consequences of doing business, and which business management can and should control and manage. Excluding such risks from coverage lowers insurance rates and provides an incentive for business owners to manage their businesses more effectively. The business risk exclusions are based on the apparently simple premise that general liability coverage is not intended as a guarantee of the quality of an insured's product or work. In an attempt to give effect to the intent underlying both the coverage and exclusion provisions of commercial liability policies, courts have interpreted such policies as insuring the risk of the insured causing damage to other persons and their property, but not insuring the risk of the insured causing damage to the insured's own work.
>
> [Section (j)(5)], an exclusion for property damage to "[t]hat particular part of real property on which [the insured] is performing operations, if the 'property damage' arises out of those operations," is a business risk exclusion. The . . . exclusion denies coverage for more than just damage

- 5 -

> to the insured's work, however, by excluding from coverage damage to
> the particular part of property on which the insured is performing
> operations.

(footnote, citations, and internal quotation marks omitted).

The parties' briefs appear to dispute the importance of Section (j)(5)'s use of "that particular part." Under Kart's preferred interpretation, which contemplates the narrowest breadth to the exclusion from coverage, Kart "operated on" (or, more precisely, "welded on") a ten-foot segment of the tower, so the segment is the "particular part" of the real property excluded from coverage. Under Kart's alternate interpretation, Section (j)(5) excludes from coverage only the damage to the tower "sleeve" but "not the damage to the coaxial cable, exterior antennas, tower mast, amplifier, components or other equipment." (Doc. 126 at 8–9) Under Essex's interpretation, which contemplates the greatest breadth to the exclusion from coverage, Kart "operated on" the whole tower, so the whole tower is the "particular part" of the real property excluded from coverage.

At a July 17, 2015 hearing (Doc. 150), Essex stipulated that if Kart's operations on the tower consisted only of the welding operations, Section (j)(5) would exclude from coverage only the damage to the ten-foot portion of the tower. Essex explained that a separate agreement (designed to prevent a fire) required Kart (1) to remove debris from the entire tower before welding, (2) to wet the entire tower before welding, (3) to wet any surrounding vegetation before welding, and (4) to monitor the area during the welding and for two hours after the welding for signs of a fire. According to Essex, these fire-prevention measures, along with the welding

operation, constitute the "operations" identified in the Section (j)(5) exclusion, which encompasses the work performed on the entire tower and the surrounding area. Thus, Essex argues that Section (j)(5) excludes from coverage damage to any part of the tower.

At the hearing (and in the briefs), the parties relied on *America Equity Insurance Co. v. Van Ginhoven*, 788 So. 2d 388 (Fla. 5th DCA 2001) (Pleus, J.), which is the Florida precedent most applicable to this action.[5] *Van Ginhoven*, 788 So. 2d at 289, considers the following facts:

> [A] homeowner . . . hired Van Ginhoven to make minor repairs to the surface of her swimming pool. Specifically, the written contract called for Van Ginhoven to make spot repairs, clean the pool surface, and replace up to six tiles. In order to do this, both Van Ginhoven and [the homeowner] understood that it would be necessary to drain the pool. As Van Ginhoven was draining the pool, water table pressure caused the pool to pop out of the ground, resulting in damage to the pool, pump, heating system, deck, screen enclosure and the surrounding landscaping and sprinkler system.

*Van Ginhoven* analyzes whether Section (j)(5) excludes from coverage the damage that Van Ginhoven caused. *Van Ginhoven*, 788 So. 2d at 391, holds:

> [T]he term "real property" is modified by the terms "on which you . . . are performing operations." At trial, Van Ginhoven admitted that when the pool popped, he was draining the pool, and thus working on, or performing operations on the pool. Therefore, this exclusion bars coverage for property damage to "that particular part of real property on which [Van Ginhoven] . . . was [performing operations]."

---

[5] Neither party cites and a search reveals no apposite authority from the Supreme Court of Florida. "[I]n the absence of a controlling decision from the Florida Supreme Court, [a federal court applying Florida law is] obligated to follow decisions from the Florida intermediate appellate courts unless there is some persuasive indication that the Supreme Court would decide the case differently." *Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1280 (11th Cir. 2003).

Because "Van Ginhoven was performing operations" on the entire pool at the time the accident occurred, *Van Ginhoven*, 788 So. 2d at 389, holds that Section (j)(5) excludes from coverage the damage to the pool but not the damage to the "pump, heating system, deck, screen enclosure and the surrounding landscaping and sprinkler system." Considering the effect of the phrase "that particular part," *Van Ginhoven*, 788 So. 2d at 391, offers further explanation:

> [The homeowner] and Van Ginhoven argue that . . . the modifying terms "that particular part of" would only exclude coverage for damage to the property Van Ginhoven contracted to work on, namely, only the specified tiles and spot repairs, but not the entire pool. This argument is untenable. At the time the damage occurred, Van Ginhoven was not working, or performing operations on, the spots subject to repair, but was draining the entire pool. . . .
>
> Conversely, damage to any property that Van Ginhoven was not performing operations on . . . is not excluded. Because Van Ginhoven was not working on the plumbing, electrical, deck work, patio, screen enclosure or the residence, any damage to those items is covered. Consistent with this logic, [the insurer] conceded in the proceedings below and on appeal that coverage existed for damage to all property except the pool itself.

In sum, *Van Ginhoven*, 788 So. 2d at 391, holds that the policy covered the damage to the deck, the pump, the heater, the screen enclosure, the surrounding landscaping, and the surrounding sprinkler system because, "when the pool popped, [Van Ginhoven] was draining the pool, and thus working on, or performing operations on the pool," not the other parts of the real property. *Van Ginhoven*, 788 So. 2d at 391, further holds that Section (j)(5) excluded from coverage all damage to the pool, not only the damage to the tiles targeted for repair, because "[a]t the time

- 8 -

the damage occurred, Van Ginhoven was not working, or performing operations on, the spots subject to repair, but was draining the entire pool."

*Van Ginhoven*'s focus both on Section (j)(5)'s use of "on which you . . . are performing operations" and on the insured's operations "at the time the damage occurred" (or "when the pool popped") establishes that under Florida law Section (j)(5) excludes from coverage only damage to the part of the real property on which the insured is operating at the moment of the accident.

*Van Ginhoven* comports with *Columbia Mutual*, which offers a more detailed justification for limiting Section (j)(5) to the moment of the accident. *Columbia Mutual*, 967 S.W.2d at 80, posits two interpretations of Section (j)(5):

> [Section (j)(5)] could . . . [exclude from coverage] the entire area of real property that [the insured] is scheduled to work. Under this interpretation, any damage the insured causes to property in the area in which he was contracted to work would be excluded from coverage.
>
> [However, Section (j)(5) could exclude from coverage] only [damage to] the part of the property that is the subject of the insured's work at the time of the damage. Under this interpretation, only the damage the insured causes to the particular part of the property that is actually the object of the insured's work when the damage occurs is excluded from coverage; any other damage would not be subject to the exclusion.

(citations, internal quotation marks, and footnote omitted).  Athwart some competing precedent, *Columbia Mutual* persuasively construes Section (j)(5) in accord with the second interpretation.[6]  *Columbia Mutual*, 967 S.W.2d at 81, explains that

---

[6] *Columbia Mutual* cites two opinions supporting the first interpretation — *William Crawford, Inc. v. Travelers Insurance Co.*, 838 F. Supp. 157, 158–59 (S.D.N.Y. 1993) (Lasker, J.) (rejecting the insured's argument that "Section (j)(5) only excludes coverage for the damage to that specific part of the apartment on which [the insured] was actually doing work when the accident occurred"), and *Jet*
(continued...)

Section (j)(5) "bars coverage for damage to '[t]hat particular part of real property on which [the insured] *is performing operations*,' not on which the insured *did perform operations*, *will perform operations*, or *has contracted to perform operations*." *Columbia Mutual*, 967 S.W.2d at 80, alternatively holds that the second interpretation is, if not the only plausible interpretation, a "reasonable interpretation." "If there are two reasonable constructions of an exclusion, the more narrow of the two must be applied." *Columbia Mut.*, 967 S.W.2d at 80–81; *accord Washington Nat'l Ins. Corp. v. Ruderman*, 117 So. 3d 943, 948, 950 (Fla. 2013) (same for Florida).[7] Accordingly, to the extent that Section (j)(5)'s timing is ambiguous, the second, narrower interpretation of the exclusion governs.[8]

---

[6] (...continued)
*Line Services v. American Employers Insurance Co.*, 537 N.E.2d 107, 111 (Mass. 1989) (Wilkins, J.) ("Whether at the time of the property damage an employee of the insured is or is not in one area or another of the property on which the insured has agreed to perform operations is not significant to the coverage question.").

[7] If an insurance contract is ambiguous, the contract "must be liberally construed in favor of coverage and strictly against the insurer." *Washington Nat'l*, 117 So. 3d at 950. Thus, if "one reasonable interpretation of [an ambiguous] policy provision[] would provide coverage, that is the construction which must be adopted." *Washington Nat'l*, 117 So. 3d at 950. "[P]olicy language is considered to be ambiguous if the language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage." *Washington Nat'l*, 117 So. 3d at 948 (internal quotation marks omitted).

[8] "Florida [state and federal] courts have consistently held . . . that the language [in Section (j)(5)] is unambiguous and therefore enforceable according to its terms." *Liberty Mut. Fire Ins. Co. v. Mark Yacht Club on Brickell Bay, Inc.*, 2009 WL 2633064, at *4 (S.D. Fla. Aug. 25, 2009) (Moore, J.). However, no Florida court has explicitly considered whether the timing of Section (j)(5) is ambiguous. *Mark Yacht Club*, 2009 WL 2633064, at *4 (holding generally that "the language [in Section (j)(5)] is unambiguous"); *Amerisure Mut. Ins. Co. v. Am. Cutting & Drilling Co.*, 2009 WL 700246, at *4–5 (S.D. Fla. March 17, 2009) (Cohn, J.) (holding that Section (j)(5)'s use of "that particular part" is unambiguous); *Oak Ford Owners Ass'n v. Auto-Owners Ins. Co.*, 510 F. Supp. 2d 812, 818 (M.D. Fla. 2007) (Whittemore, J.) (stating generally that "Florida courts have held that exclusion[] 2j(5) . . . [is] not ambiguous and [is] therefore enforceable according to [its] terms"); *American Equity Ins. Co. v. Van Ginhoven*, 788 So. 2d 388, 390–91 (Fla. 5th DCA 2001) (Pleus, J.) (holding that Sections (j)(5)'s use of "real property" is unambiguous); *U.S. Fire Ins. Co. v. Meridian of*
(continued...)

- 10 -

*Van Ginhoven*, *Columbia Mutual*, and the lack of any contrary Florida precedent defeat most of Essex's argument. Essex named four of Kart's fire-prevention operations that involved the entire tower, and three of those operations (the most significant three) finished before Kart's welding began — the debris removal, the wetting of the tower, and the wetting of the surrounding vegetation.

Responding to *Van Ginhoven*, Essex states:

> Unlike *Van Ginhoven*, it was not only understood between Kart Construction and [the operation's general contractor] (or any other entity) that Kart Construction would need to prevent fires to perform the welding, but Kart Construction had executed a separate agreement . . . providing a detailed, comprehensive list of fire prevention activities to safeguard the entire cell tower including the attached communications cables and antennae.

(Doc. 120 at 13)[9] Essex's argument misunderstands *Van Ginhoven*, which establishes that the dispositive issue is the "operations" that Van Ginhoven performed at the moment of the accident, not the tasks that the contract explicitly contemplates. *Van Ginhoven* relies on Van Ginhoven's draining of the pool to exclude from coverage damage to the pool even though Van Ginhoven and the property owner merely "understood that it would be necessary to drain the pool." If Van Ginhoven's

---

[8] (...continued)
*Palm Beach Condo. Ass'n*, 700 So. 2d 161, 162 (Fla. 4th DCA 1997) (Polen, J.) (holding generally that "there were no ambiguities in the insurance policy," which included a clause identical to Section (j)(5)).

[9] Essex attempts to distinguish between this action and *Van Ginhoven* by identifying the express fire-prevention agreement because Van Ginhoven almost certainly employed precautions on property that Van Ginhoven later damaged and that the policy covered. For example, although Van Ginhoven likely deactivated the pump and heater before draining the pool in order to avoid damaging the pool's pump and heater, Section (j)(5) excluded from coverage only the damage to the pool.

- 11 -

express contractual obligations determined the damage excluded under Section (j)(5), *Van Ginhoven* would not need to focus on the fact that Van Ginhoven "was draining the pool" "when the pool popped." To exclude the damage to the entire pool, *Van Ginhoven* could have relied on the "written contract," which "[s]pecifically . . . called for Van Ginhoven to . . . clean the pool surface."

Three of the fire-prevention activities that Essex identified finished before Kart began welding. Under *Van Ginhoven* and the text of Section (j)(5), those three operations have no effect on the application of Section (j)(5). Only the fourth fire-prevention "operation" — Kart's monitoring for a fire — persisted during the welding. Nonetheless, Kart's monitoring fails to exclude from coverage the fire damage because monitoring is difficult to describe as an operation performed "on" anything and is even more difficult to describe as an operation performed "on" everything in view. Under Essex's implausible interpretation of Section (j)(5), Kart simultaneously and contemporaneously conducted "operations" — and triggered the exclusion — on every "part" of the real property within the monitor's view.[10]

Finally, Section (j)(5) excludes damage to the particular part of real property on which Kart is performing operations only "if the 'property damage' arises out of those operations." Because Kart monitored the tower under, in Essex's words, a

---

[10] Even assuming Kart's monitoring constituted an "operation" performed "on" something, the most persuasive contract interpretation is that Kart performed the monitoring operation "on" the property "on" which the monitor stood, that is, the property beneath the monitor's feet — the monitor's footprint, rather than everything on which the monitor gazed at the moment of the incident (which one could never reliably determine). Because the monitor stood, at the time of the accident, on property that the fire never damaged, the monitor's operations are irrelevant to the interpretation of Section (j)(5) and to this action.

"separate agreement" (Doc. 120 at 13) and because the operations under the separate agreement (that is, the fire-prevention operations) caused no damage to the property, the monitoring (as well as the other fire-prevention operations) is irrelevant to the resolution of this action.

*Liberty Mutual Fire Insurance Co. v. Mark Yacht Club on Brickell Bay, Inc.*, 2009 WL 2633064, at *6 (S.D. Fla. Aug. 25, 2009) (Moore, J.), states:

> In determining whether exclusion[] j(5) . . . appl[ies] here, the Court is faced with facts unlike typical duty to defend cases involving [commercial general liability] policy exclusions. In cases like *Van Ginhoven* . . . , a contractor is hired to build a specific building or perform a discrete task within a defined area. Here, [the insured] had several different kinds of obligations under the Contract — to maintain, manage, and operate — and those obligations extended to the entire premises of [a] condominium complex. [The insurer] argues, in effect, that [the insured]'s "work" therefore encompassed the entire Project and all damage thereto. But the Project itself, and the damage to it, cannot be synonymous with [the insured]'s "work." If this were true, the Policy would be a nullity, as would the [commercial general liability] policies of any other company that contracts to manage or maintain an entire facility.
>
> With respect to exclusion[] j(5) . . . it is [the insurer]'s burden to specifically identify, with reference to the underlying complaint, what "particular part of real property" [the insured] was working on that was damaged by [the insured]'s operations. [The insurer] has made no such specific showing. The underlying complaint, with its very general defect allegations, does not describe what part of the Project [the insured] was working on that experienced defects or deficiencies, or what particular actions by [the insured] gave rise to those deficiencies.

(citations omitted).[11]

---

[11] Also, Essex's argument is likely incompatible with *Van Ginhoven*. Van Ginhoven almost certainly monitored the deck, patio, and other parts of the real property while he drained the pool. Nonetheless, *Van Ginhoven* holds that Section (j)(5) excluded from coverage only the damage to the pool, not the damage to the "deck work, patio, screen enclosure or the residence." Thus, *Van Ginhoven*'s failure to discuss Van Ginhoven's monitoring is better interpreted as holding *sub silentio*
(continued...)

In sum, Section (j)(5) excludes from coverage damage to "that particular part" of the real property on which the insured is operating at the time of the accident, and at the time of the accident, Kart's (relevant) operations occurred only on a ten-foot portion of the tower.

**2. Section (j)(6)**

Section (j)(6) excludes from coverage damage to "[t]hat particular part of any property that must be restored, repaired or replaced because '[the insured's] work' was incorrectly performed on it." The correct application of Section (j)(6) is somewhat similar to the application of Section (j)(5). Essex's motion for summary judgment and Kart's response discuss the two exclusions simultaneously.

In this action, no difference exists between the meaning of "operations" in Section (j)(5) and the meaning of "work" in Section (j)(6). Unlike the "operations" under Section (j)(5), the "work" under Section (j)(6) need not occur at a specific time (e.g., the moment of the accident) for the exclusion to apply. Section (j)6) excludes damage to a "particular part of . . . property" if the insured "incorrectly performed" work (at any time) on that part and the "incorrectly performed" work caused, or contributed to, damage to that part.

No relevant difference exists between the welding at the moment of the accident and the welding before the accident; the welding before the accident

---

[11] (...continued)
that Van Ginhoven's monitoring (even, perhaps, from the pool's deck) had no effect on the breadth of Section (j)(5). Similarly, Kart's monitoring has no effect on the breadth of Section (j)(5) in this action.

excludes from coverage the same damage as the welding at the moment of the accident.  Also, no relevant difference exists between the monitoring at the moment of the accident and the monitoring before the accident; like the monitoring at the moment of the accident, the monitoring before the accident excludes no damage from coverage.  However, the other fire-prevention activities differed from before the accident to the moment of the accident because Kart completed the other fire-prevention activities before the accident.  Kart removed debris from the tower before welding, Kart wet the tower before welding, and Kart wet the surrounding vegetation before welding.

In sum, under Section (j)(6), the policy might exclude the damage to the tower if Kart incorrectly performed fire-prevention work on the tower (that is, incorrectly removed debris from the tower or incorrectly wet the tower[12]) and that incorrect work caused, or contributed to, the tower's damage.  However, according to Kart, throughout Kart's work "all fire prevention measures were in place," and "[t]he fire occurred by chance from unknown or remote causes."  (Doc. 125 at 2–3)  This order must construe the facts in favor of Kart, the non-movant, and Essex has presented no support for concluding that Kart incorrectly prepared the tower for welding.

---

[12] Under Section (j)(6), Kart's wetting of the surrounding vegetation cannot exclude damage to the tower because that wetting constitutes work "on" the vegetation, not work "on" the tower.

## CONCLUSION

Essex, "as the insurer, bears the burden of showing that a particular exclusion applies." *Liberty Mut. Fire Ins. Co. v. Mark Yacht Club on Brickell Bay, Inc.*, 2009 WL 2633064, at *5 (S.D. Fla. Aug. 25, 2009) (Moore, J.). Essex has failed to demonstrate that an exclusion applies. Accordingly, Essex's motion (Doc. 120) for summary judgment is **DENIED**.

Essex's complaint cites Sections (j)(5) and (j)(6) as the basis for excluding from coverage damage that the fire caused. This order explains why Section (j)(5) is inapplicable, and Essex has failed to present any support for the applicability of Section (j)(6). Under Rule 56(f), Federal Rules of Civil Procedure, "[a]fter giving notice and a reasonable time to respond, the court may . . . grant summary judgment for a nonmovant." No later than **AUGUST 28, 2015**, Essex must explain why an order should not grant summary judgment for Kart under Rule 56(f). Essex must identify admissible factual support demonstrating (1) that Kart "incorrectly" removed debris from the tower, "incorrectly" wet the tower, or "incorrectly" performed some other work "on" the entire tower and (2) that Kart's "incorrect[]" work caused, or contributed to, the fire damage.

Also, Essex moves (Doc. 138) to continue the pre-trial conference and the trial. Because the magistrate judge has conducted (Doc. 142) the pre-trial conference, the motion (Doc. 138) to continue the pre-trial conference is **DENIED AS MOOT**. The motion (Doc. 138) to continue the trial is **DENIED**.

Kart moves (Doc. 148) for "protection for August 6, 2015," and Essex moves (Doc. 149) for "protection for August 25, 2015." The parties are directed to move no further for "protection." If a higher priority scheduling conflict occurs, a party may move to continue. The court is ill-equipped (and disinclined) to manage an unending sequence of motions, many entirely moot or speculative, designed to accommodate the court's docket to every party's and every counsel's preferred schedule. The motions (Docs. 148, 149) for "protection" are **DENIED**.

On June 12, 2015, Essex moved (Doc. 135) to amend the complaint to add a claim. As the June 11, 2014 case management and scheduling order (Doc. 43) explains, under Local Rule 3.05(c)(2)(E), "[a] motion to amend any pleading . . . is distinctly disfavored after entry of the Case Management and Scheduling Order." The case management and scheduling order appeared on the docket more than a year before Essex moved to amend the complaint. "A plaintiff seeking leave to amend its complaint after the deadline designated in a scheduling order must demonstrate 'good cause' under Fed. R. Civ. P. 16(b)(4)."[13] *Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1241 (11th Cir. 2009).

Essex argues that the proposed claim is based on information that "Essex only learned . . . on June 11, 2015." (Doc. 135 at 2) However, Essex fails to explain why Essex learned the information only on June 11, 2015. Under *Southern Grouts*, 575 F.3d at 1241 n.3:

---

[13] Essex mistakenly argues for an amendment under the relaxed Rule 15(a)(2) standard.

- 17 -

> The lack of diligence that precludes a finding of good cause is not limited to a plaintiff who has full knowledge of the information with which it seeks to amend its complaint before the deadline passes. That lack of diligence can include a plaintiff's failure to seek the information it needs to determine whether an amendment is in order.

Because Essex has failed to demonstrate that Essex diligently sought the needed information and because, as Kart explains, Essex "chose not to pursue any discovery," "took no depositions," and "propounded [no] written discovery" (Doc. 139 at 3), Essex's motion (Doc. 135) to amend is **DENIED**.

ORDERED in Tampa, Florida, on August 10, 2015.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE